The Fort DeSert Appellate Court of the State of Illinois has reconvened. The Honorable Eugene G. Doherty presiding. Good morning. The court is calling People v. Ely, case number 424-0884. Would counsel for the appellant please state your appearance? Your Honor, for the record, my name is William Wolfe, W-O-L-F, from the Law Office of William W. Wolfe, Chicago, here on behalf of the appellant, Robert Ely. And for the appellee? First name Allison Page, last name Brooks, on behalf of the people. All right. Mr. Wolfe, you may proceed. Thank you, Your Honor. May it please the court and counsel. Your Honors, what we have in this case, in this first-degree murder case, where there was a lot of public interest and a lot of law enforcement interest as a result, is a case of misconduct in closing argument that was important and egregious because the prosecutor in the opening close kept inserting his opinion into the matters. Specifically, the two arguments in which he did so were essentially, first of all, that Did we lose him? It appears that we have, oh, here he comes. We lost you there for a minute, Mr. Wolfe. Can Your Honors see me and hear me? Yes. Okay. I apologize for that. I believe I have a stable, I'm doing this on vacation and I believe I have a stable Wi-Fi and I apologize for any hiccups on my end, Your Honors. All right. You may continue. Thank you, Your Honors. The first egregious argument was essentially that Calissa Scott, the sole eyewitness in this case, picked the person that we all agree is the defendant. In that particular argument where there was an objection and not a favorable ruling, the prosecutor was directly attempting to place everybody, the jurors and him and his partner, and his trial partner, all on the same team, that we all agree that we are seeing the same thing. That's especially true given how extremely problematic Ms. Scott's identification was in this particular case. The photo was in the second photo array and she did not make an identification. I believe that was on April 8th, if I'm keeping my facts straight, and then sometime, I'm sorry, on March 8th. And then on April 22nd, when she made her positive identification, it was a case where she went through the photo arrays three times. This, I would urge the court, is an important case as far as to assess on appeal for identification and how strong it is to review the video that was admitted to the jury as far as her prior photo lineup identification, where she is pausing, she is hemming, she is hawing, and finally makes an identification. What's even more problematic is on cross-examination when she's given the look at the photo array envelopes herself, even with Mr. Eli in the courtroom, she can't identify what photo that she picked out that the state was using to say that this was a positive identification. Your Honor, the reason why this is so problematic in a nutshell is that the state isn't putting in their own imprimatur, not just personally as people, but the office of the Peoria County State's Attorney's Office, to say, trust us, we would not be bringing this case unless we thought this identification was reliable. And that's further compounded because a short period of time later, the prosecutor tells the jury, and yes, Chief Judge Gorman did sustain this objection, but I know that's the killer. You know that's the killer. And I would argue in this particular instance, Your Honor, that while we can be grateful from the defense point of view that Chief Judge Gorman did sustain the objection, that that simply was not good enough under the circumstances. And under the circumstances, I would argue to this court that this court should take action, not just for Mr. Eli's sake, but for future prosecutions that this court is going to oversee in the future and say that this kind of conduct and this kind of commentary must stop. What's also problematic as far as a third argument that is cited in our position, Your Honor, is that, well, Nancy Marshall, the decedent's wife, was going through, at the time of the killing, a great deal of medical issues herself. She was essentially catatonic. She could not speak. And she was being kept, at the time, in a front room by the living room, very far away from where the killing took place, which was in the basement. And the prosecutor argued essentially to the ladies and gentlemen of the jury that Nancy Marshall could hear everything. And essentially, the implication was that she could understand everything and that she was a horrible, silent witness to her own husband's murder, for which there was absolutely no evidence of this. And it was nothing more than just to inflame the passions of the jury against Robert Eli. This is a much more egregious instance than what we've previously seen in other arguments that call upon to think of the victim's family members. This goes well beyond that. This asks the jury not to think of the Marshall family, but to think about what Nancy Marshall went through on that day, when there is no evidence in this record that she went through anything. And the geography of the building would suggest to anyone that she didn't see or hear anything. Yet the prosecutor argued otherwise. And I would argue, to your honor, that this was egregious. I would argue that it was intentional. And it served no purpose in any fashion on a case that had very problematic eyewitness testimony to say that Robert Eli must have been the burglar who committed this crime, or this series of crimes in terms of him being the one who committed this art heist. What's the standard for reversibility on an argument of that nature? Is there reason to think that that isolated remark in the length of this trial would have substantially prejudiced the defendant? The answer is yes, as far as prejudice, your honor. I would ask the court to consider it individually. I would ask the court with the other two arguments to consider it cumulatively. Any time where a prosecutor in a closely balanced case that I would argue that this is, argues for something that you would see or hear about in a horror movie or an Edgar Allan Poe short story, as far as being trapped and seeing something that you cannot get out of, it reminds me of Jimmy Stewart's role in one of Hitchcock's horror movies. I'm blanking on which one, but that's the one that comes to mind right now. Rear window. Yes, sir. Thank you, sir. It served no purpose. And it essentially, I think this, I would urge this court to essentially send a message to the state's attorney's office to please stop doing this. Otherwise, there's reason to believe, and we argue, citing to rule 23 opinions involving the same state's attorney's office, that they'll be encouraged to keep doing this until they're told not to, with repercussions behind it. So I would argue that in a closely balanced case like this, notwithstanding my learned opponent's arguments that the evidence is overwhelming, I take issue with that. And I believe I deal with that in the reply brief. But based on that, I would say, yes, it was a lengthy trial. All the more reason why in a closely balanced case, Your Honor, it is egregious for them to rely on such an emotional argument. But what is the standard of review? That's what Justice Doty asked you, and I don't think you answered it. I would argue that normally it's, I would say it's an abuse of discretion standard as to whether or not the court should have sustained the objection or not. I know that there's a tension amongst the appellate courts. I note that in the opening brief as far as what the review standard seems to be in this situation. But I would argue under any standard of review that reversal is appropriate. Though I believe it's an abuse of discretion standard, I would argue that Chief Judge Gorman should have sustained the objection, should have instructed the jury to disregard it, and that did not happen. Okay, thank you. If I've answered the questions and if I can move on, I would like to talk about what happened as far as the other crimes evidence in closing. This was a case where the state sought to bring in a, I'll call it the Glen Carbon burglary, for the lack of a better framing, for the purposes of identification and modus operandi. And I would argue to the court that, first of all, Chief Judge Gorman abused her discretion by admitting the evidence in the first place. And I would say that the reason why for that is because there was no evidence that this burglary, first of all, did anything to aid in an identification by Calissa Scott, the problematic witness I've already spoken of, whose eyewitness issues are replete in the record, as well as these two instances are nothing alike. They do seem to involve the same burglary ring. I would submit that that is fairly obvious. But in one instance, in the Glen Carbon instance, two people were involved, Robert Eli purportedly, and a second unknown person, unknown to this day, where allegedly in the murder case that's before this court, this was a one-person incident. Second of all, Robert Eli, if the state could prove anything, was a small-time burglar. He would be stealing money, jewelry, get in and get out. This was not, this, and I mean the homicide, was nothing like this. This was an art heist. This was something planned. And I would argue that it was planned by Tilly Frank and whoever Tilly Frank sent to the Peoria address for the purposes of trying to take several high-value paintings, I believe in the end it was seven in total, and get them for storage for the purposes of resale at a value that I believe was valued somewhere between the $100,000 to $500,000 mark. Robert Eli's crimes, both in the other crimes motion itself in general, as well as what the state produced in the motion hearing and at trial, the two instances are nothing alike in terms of their objective, as well as it was very, it was established at both the motion and at the trial that the tactics used in both instances are something common to very common burglars, which Robert Eli was and is. And that is why the eyewitness identification evidence is all the more fraught, and I would argue to this court, incorrect the third issue in our brief, as far as allowing, in the Glen Carbon incident basically, a identification through camera to say that that was Robert Eli to invade the province of the jury. I would argue that this identification evidence was improper, and that it helped to just prejudice the jury against Mr. Eli, in addition to the other crimes evidence that Chief Judge Gorman's ruling was to permit this evidence with or without the identification being allowed, was an abuse of her discretion. On the identification, the record isn't clear, and I don't know that we can assume whether a live ring doorbell view is clearer or better than the taped ring doorbell view, the recorded video. If the live is clearer, then this witness was in a better position than the jury watching the tape, and her identification would be proper. Do you disagree with that? I believe that it's hard to say because there's not a lot of case law on this. I would be tempted to agree with your honor. The problem is that the record is silent on this issue, and it's the state's burden in order to... Understood, understood. But the other possibility is that they're the same, that the video is the same, whether it's live or recorded, in terms of its quality, in which case, probably not proper to have a witness give an identification when she's in no better position, no greater knowledge of the defendant than the jurors. But isn't it hard not to find it harmless when the jurors can see the video themselves and make their own judgment about whether that's the defendant? I would argue it's not harmless because they're providing other crimes evidence to basically, that has the risk of being propensity evidence, your honor. That's a separate issue. You're talking about the identity, right? You had a separate issue here about whether this witness should have been able to identify the defendant on the video. And with respect to that issue, since the jury saw the video, if it's the same as the live feed, maybe improper, but how could that be reversible? Because they could make their own judgments about whether that's him on the video. And they should be allowed to make their own independent judgments, your honor, without eyewitness or alleged purported eyewitness influence on the jury. Judge, your honor, I would disagree slightly with something that your honor said as far as the premise of your question, if I may. This is actually a case where the jurors have a better position than the eyewitness herself. And the reason simply being they had this was a lengthy trial, as your honor already noted. They had an opportunity for many days to see Mr. Eli in the courtroom for jury selection, opening statements, and all the witnesses up to that point in time. This was hardly the first couple of witnesses right out of the box, so to speak, your honor. And so they've had a chance to study Mr. Eli and look at Mr. Eli for a very long time. It cuts two ways, though, because the image of the person is fairly clear on that video. They've seen the defendant. I don't know that you can talk somebody into saying that that's someone on the video other than who you think it is. How could this not be harmless? Judge, any invasion of the province of the jury, especially when it comes to other crimes evidence, and that's the other premise of the question that I wanted to disagree with your honor with, this is not a case in terms of in the case in chief, an eyewitness identification through a video. This is part of the parcel as to why supposedly this other crimes evidence was admissible in the first place to bolster identification. And really, this involves, for the lack of a better phrase, your honor, double bolstering. And so I would take issue with the court statement. And I would argue that given the closeness of the evidence in this case, that it must be Robert Eli who committed this crime versus anybody else that Tilly Frank easily could have sent. That is why I take issue with it, your honor, especially since there was no effort to investigate anyone else, including the second person that exists just as equally and clearly in the ring door camera footage on the quote unquote Glen Carbon incident. But weren't the facts, if you look at both, you look at the video, there's the white truck, there's the defendant, there's the going to the door, trying to gain the trust of the homeowner, and then the bucket that was used in both crimes. So there's four similarities. And you're saying the one difference is that there was another guy that they didn't investigate. Am I understanding you correctly? Judge, you're correctly stating some similarities and differences. But as your honor, in reviewing the record, why am I blanking on his name? One moment, your honor. Oh, of course. When speaking of Pedro Gonzalez, a number of people, your honor, had access to this truck, used this truck. For Pedro Gonzalez's testimony that's in the record, this is Tilly Frank's truck. And he's testified that he used it, that Robert's son, Nicholas used it. This was a truck that a number of people had access to. And the issue, your honor, is that there are similarities that your honor pointed out that are common for many burglars and not just Robert Eli. This is not a fingerprint that only Robert Eli does. And that is in this record, which is why we're taking such strong issue with it, your honor. All right. Thank you, Mr. Wolf. Your time has expired. You'll be given time in rebuttal. Ms. Brooks? Thank you, your honors. May it please the court and counsel. Actually, in this case, the evidence was overwhelming because Calissa Scott's ID was in fact corroborated by many substantial items of circumstantial evidence. I think the defendant's idea of this being a closely balanced case is that this could have been another different of this Tilly Frank burglary ring that was the perpetrator of the murder in Peoria rather than the defendant. I think that's the defendant's theory is that it's kind of closely balanced as to whether it was defendant or someone else in the same burglary ring. But there's actually a surveillance video near the time of the murder in the neighborhood of the doctor's house that shows the lone male driver that has a gray goatee and mustache. So that substantially narrows it down in terms of the similarity to the defendant's own physical description, which is the scruffy gray goatee and mustache that he had, as well as Calissa Scott says the perpetrator that she met at the door before the murder had poor teeth and spoke with a Southern-like accent. I believe the defendant was Romany. It was kind of this accent was characterized as sort of being Southern-like when he interacted with the police, as well as he had poor teeth. So the combination of the defendant's poor teeth and the gray scruffy facial hair and the Southern-like accent, I think matches not only surveillance video portions of that from the surveillance video, but also Calissa Scott's description of the perpetrator. Plus there's the Pedro Gonzalez testimony. It was the defendant who is bringing down the white work truck, the F-250 that had the power washer in it and the power washing stated on the side of it. So it's the exact same truck was in the surveillance video in Peoria that was taken south and parked. Now that truck contains not only one of defendant's personal cell phones, but also the murder weapon with the match to the victim's DNA. Also there's the other Glen Carbon burglarizing valuables as well. But the other thing is the defendant's master bedroom had a key to the lock that would the FBI cut off the self-storage unit that contained the paintings. So therefore I think it's pretty obvious and overwhelming that the defendant was in fact the perpetrator of the murder in Peoria of the doctor. And therefore the comments that they rely on for would not be reversible error because strength of the evidence is one of the most and can be the decisive factor in determining whether allegedly improper comments were reversible error. In other words, it has to be the prejudice from the comments has to be so prejudicial that the verdict would have resulted from the error and not from the evidence. And in this case, the strength of the evidence was so strong that the comments were not reversible. One of the argue about in terms of the comments was that I know that's the killer that was sustained, but the other alleged vouching was the idea that when Calissa Scott picked a person, we all agree is the defendant, but was she wrong was the argument. No one disputed that the defendant was the person in the photograph that Calissa Scott identified. There's no vouching for Calissa Scott's with a defendant calls observational abilities. So the vouching is not here that that Calissa Scott, the prosecutors not saying that Calissa Scott identified the right person. They're saying is she identified someone whose photo is the person we all agree is the defendant. But was she wrong? In other words, say that that's the argument is that, yes, she identified a photo of defendant, but that's not saying the prosecutors not saying that she identified the defendant and put in the prosecutors the weight of the office behind that identification. With respect to the claim that the so-called silent witness, Nancy Marshall, the doctor's wife, that this is sort of a reference to the victims, like the deceased victims surviving family members. Well, actually, she's a victim herself. This is a residential burglary case. She is in the house. She's in the same house at the same time of of a physical confrontation and a murder. But she's not the victim of this crime as charged. She's he's charged with murder. She's not the victim of the crime that he's charged with. Actually, I thought there was the charges were if I could find that. They added counts to six forty six. And the record. Yes, it's first degree murder and residential burglary on page, I believe, C-49. So, I mean, the case is a residential burglary case, not just first degree murder. She's an occupant and presumably co-owner of this house with her husband. And these are some of her paintings, too. Was that the nature of the comment? Wasn't the nature of the comment how horrible it was that she was in the house when her husband was murdered? Yes, that was the nature of the comment, but she's at the scene. She's she's she's a co-victim of the burglary. But yes, she's also at the scene during the murder. And I'm not sure that they the arguments about, well, this person left behind a surviving family and how awful is that is sort of the argument made to jurors in other cases. I don't believe that's the argument here. I'm not even sure if she survived to the time of trial. But the point is that the claim here is is is not that she's a a it's so awful. She's a surviving member of this family. And I think it's the idea is that she's here as a co-victim of a burglary and was actually present during the time of the murder. I appreciate that you have characterized it as being about her status as co-victim of a burglary, but the comment doesn't seem to be about that. It seems to me that even if she had seen the murder. To attempt to play on the jury's sympathy and passions for her having to go through that really wouldn't be relevant to the question of whether the crime was committed might be relevant at sentencing, but it really isn't relevant at the as to the question of whether the crime was committed. And so you're being very narrow in terms of talking about the effect on families and surviving families. But the point of those cases is you're you're reaching out to try to make an emotional connection to the jurors on something that shouldn't control their in the case. I find it difficult to defend. Well, there was an objection in this case on that there is a an object an instruction that the jurors received that they're not supposed to consider sympathy. So this is not as egregious as the defendant is insisting that this is this is more along the lines of an isolated comment. The jurors do receive an instruction not to consider sympathy. This court should presume that the jurors in fact followed that instruction. So to sort of reverse on the basis of this particular argument, to the extent if this court wants to find it improper, just to send a message to the Peoria County State's attorney that enough is enough, even though the case, if this court finds it to be overwhelming to I think the defendant says that there must be repercussions for this because of they cite other cases involving Peoria. That's not the proper outcome of a reviewing court is to reverse a case when it's not warranted simply to send a message to a particular prosecutor's office that this sort of type of conduct is shouldn't be countenanced. I believe that if this court finds this comment improper, the proper course would be to find that the evidence was in fact overwhelming. There was no substantial prejudice. This error was not reversible if it was an error and and simply affirm. And if the court wants to make and direct any comments to the parties regarding the nature of this error, that would be within the court's prerogative. But essentially to use this court to reverse the conviction in this case would be an improper exercise of the powers of reviewing court when the standard is that the the evidence has to be, I'm sorry, the error has to be so prejudicial that the verdict could have resulted from the error. If that standard is not met, then the correct outcome is affirmance. With respect to the other arguments, there is in fact, I think defense says that the Glen Carbon crime was quote nothing alike. There isn't some differences. I mean, the jewelry can be very valuable. Art obviously is very valuable in some respects can be. So I mean, these are these are things they're not just stealing like tools out of the garage or they're there. I mean, these are high value items. Jewelry and art, I think, should be considered to be very similar. So the involvement of a second person doesn't take this out of modus operandi because it has requires a strong and pervasive, persuasive showing of similarity. Here, the claims to know an elderly resident, whereas in Peoria, you have him grabbing the mail and wanting to talk to Bill. I mean, it's like I'm on a first name basis and I can bring in his mail. I mean, it shows a high level of familiarity. And then they're both victims that are targeted are elderly. There's the involvement of the white F-250 work truck and involvement of buckets of water as a ruse to distract. And so the theft of valuable collectibles from elderly residents here, I think this shows that this is a type of modus operandi that they use in order to perpetrate burglaries. So therefore, it was properly admissible and also admissible in identification. These are not necessarily... I think the case law has taught us that modus operandi and identification are one in the same. The purpose of identifying somebody's mode of doing something is to identify them. So there really aren't two different points. Right. But to be modus operandi, I believe it has to have a stronger showing of similarity, which I believe that standard is easily met here. There's the defendant, I believe, says that these are common tactics, but I don't believe there's anything in the record shows that this type of burglary perpetrated by a specifically marked work truck using buckets of water, that somehow, you know, garden variety burglary practice, that that shouldn't be considered modus operandi in a case like this. With respect to the live surveillance video, to stay sand on a citation to the Tomei case. I mean, in Tomei, it says they... Looking at live video feed is like looking through a telescope. And here, as soon as Nguyen was at Glen Carbon's, at the house in Glen Carbon, when the defendant shows up, she could have gone into court, says, when she is asked to identify the defendant in court, and she could have said, yes, that's the defendant. And here she's asked to identify the defendant in court, but she saw him through a live video feed instead of being live at the scene or like looking through a telescope, I think, as the Tomei says. So the technology doesn't take out the fact that she was watching the scene of the crime at the same time it was happening and therefore gained familiarity of the defendant. So this is not the same situation as... She gained familiarity with whoever was on the video. But if the video live feed is the same as the recorded feed, she really isn't in any better position than the jurors. And in fact, as counsels pointed out, they've seen him longer sitting in the courtroom. So we don't really know if the live feed is better or the same. But the cases like Thompson, though, that was an anhydrous ammonia theft case. And it just said, a camera, just look at the tanks, see who shows up, and then later somebody can try to identify the people who were in that video. But they didn't see it at the time. Here, the point is, if you're going to identify somebody in court, you're not having to identify them necessarily as the person in the video. You're also identifying them as person in court. And it doesn't really matter how you gained sight of the defendant at the time of the crime, whether through technology or live in person. And so that's why this is different. This is not simply just a witness who has no better ability than the jurors to identify somebody who is reflected in the video. This is a witness who saw the defendant live around the time of the crime. She saw the video live at the time. Right. She saw the video. She saw the defendant in the video through technology. But Tomei says that's basically no different than having like looked through a telescope. If she was across the street looking through binoculars, she could understand the same thing. But the difference is that the jury can't also see through the telescope. But on the video, the jury can see the same video. Right. But it's kind of odd that that situation is that if she had stood there and saw the defendant and it was on video, but like she wanted to identify him in court, it's like she can't she cannot identify them in court. But she thought she saw him in person in that hypothetical rather than seeing him through the video. The problem is finding some way to say she had a better advantage than the jurors. And that's why we're going to hear from her. If she saw a video feed that is the same as the recorded video feed, it becomes hard to make that argument. Right. But I guess the argument is that she is being asked to identify him in court. It doesn't really matter how she gains the person that she saw through the technology, of course, but she can identify that person in court. And the idea that she should not be allowed to identify him in court simply because there was a recording of the of the crime. I mean, that's at least part portion of the crime. I mean, I don't understand why she should not be allowed to testify that the person she saw live in real time was the person sitting at the defense counsel's table. She can identify him in court simply because the jury can also look at a video. That's why I guess the state relies on a Tomei case. And it's different from the Thompson case where they're in those situation is simply only dealing with a like surveillance camera where no one is watching it live. No one can someone has to go back and look at it later here. It's it is a difference when somebody can see it live. And that's what I'm not getting persuaded on. Why would it be different if the image is exactly the same? Why is it different? Because to me, it says it doesn't really matter how she saw him. She saw him in real time and she can then identify him in court through that technology. It doesn't matter whether she was standing at the scene or not. And the state doesn't really understand why the fact that a recording of portion of the crime exists would prevent her from being able to identify the defendant in court when she had seen him in real time around the time of the crime. I mean, isn't identification a form of lay witness opinion? And that is true. And lay witness opinion has to has to help the jury. Yes. And if you're not giving the jury more than the jury could do itself, it's hard to characterize it as being assistance to the jury. Well, if that were the case, then a case like to me would have to be overruled because no, because the jury didn't have the same view. So so the rule then would be if that situation is that if for some reason the ring doorbell recording had not been preserved, then she could identify him through the ring doorbell recording in court. But because they have the I'm just trying to understand this because they have the actual video. Therefore, she cannot testify. She cannot cannot identify him in court because the jurors could see for themselves from the video whether that's the person sitting in court. All I'm saying is you've made a big difference from the fact that it's live versus a Memorex. And I'm just not sure I'm seeing the significance of it. Well, that's the distinction that was has been drawn into cases like to me is that if the witness has live view, even through technology, it doesn't really matter. And that's why if there is some distinction that to me makes that I don't see. I mean, I guess I'm trying to understand is like why she cannot testify. She cannot identify him in court, regardless of how she obtained that identification. If she saw him in in real time, she should be able to identify in the court. That's the state's position. And that would be the extent of my request this court to affirm. Thank you. All right. Thank you. Back to you, Mr. Wold. You could hear. Imagine that this was not a cry to think of a person as far as a residential burglary victim or a theft of her property. This was for a woman on the main floor off to one side for the photographic evidence that's available for this court to review. She could hear the clear argument was what happened to her husband. There is no evidence to believe that that's there's no evidence in the record to support this. There is no evidence to believe that that's even true. And moreover, there is no purpose for this other than to inflame the past passions of the jury, because they're not even arguing the fact they're asking the jurors to imagine literally. And that is what is egregious about this. In addition to the fact that Nancy Marshall at the time, very sadly, was going through what she was going through in terms of being in a catatonic state and not being able to interact with anyone. The prosecutors used that fact to maximum effect for no purpose other than to try to get Robert Eli convicted of first degree murder. Mr. Wolf, Miss Brooks points out that jury instruction to not allow sympathy or prejudice to influence the jury's decision is enough to cure this error if it's error. What do you have to say about that? I would say for an argument this egregious, inviting someone's imagination of what I termed earlier in my opening argument, an Edgar Allan Poe horror story or rear window, as it's been suggested to refresh my memory. It is a horror story that the prosecutor is raising up. And there are some things that instructions just cannot fix, Your Honor, especially because, and I do take issue with what counsel argued, this case is closely balanced. It's fairly clear that the state proved that someone in Tilly Frank's Romani ring was sent to Peoria. The question is, was that Robert Eli beyond a reasonable doubt? And the answer, if you look at the totality of the evidence, is no. For example, the state argument just now asked you to consider where the key for the storage space was found. The problem with that argument is that is Tilly Frank's bedroom as well. So she would have that key no matter who she sent. The same thing as far as arguing that this is Mr. Eli's work truck. It is not per the testimony in this record. It is Tilly Frank's truck and a number of people were using it. The state was also just arguing to Your Honors just now about how Mr. Eli's cell phone, personal cell phone, was found in the vehicle. But she leaves out, as I noted in the reply brief, Your Honor, that that phone was shut off for many, many months prior to the date of the murder and was simply lost, sandwiched behind, I believe it was, if I'm remembering the facts correctly, the driver's seat and the, essentially, the place where that separates the metal, that separates the cab from, you know, the back of the truck where the knife was found. So the fact that the knife was found in this truck certainly implicates the truck. It certainly implicates Tilly Frank and her ring. But whether or not it is exclusively Robert Eli, beyond a reasonable doubt, is highly, highly in any case, Your Honor, when Your Honors have to evaluate this, depends always on what the defense is and comparing the two. The state could point to, in a sexual assault case, the fact that the defendant's DNA was found as argument to the court to affirm because they found DNA. But if it's a consent defense, for example, where the defendant is admitting to having sex with the person in question, then that really has very little bearing. And by analogy, the prosecutor relying on these arguments, when it also fits the defense evidence as well, and the defense theory, really is a nullity. With that, Your Honors, I would ask Your Honors to reverse Mr. Eli's conviction and remand for a new trial. I see my time is up unless there are questions. One final question for you, Mr. Wolfe. Isn't Calissa Scott's testimony proper to establish foundation for the video? When you say proper to establish the foundation of the Glenn Carden video, Your Honor?  If they are going to use, under a theory of identification, the other crimes evidence, then whatever the other crimes evidence is has to in some way be shown to bolster the identification. I'm talking about the point of simple whether her testimony was proper, not whether the evidence itself is proper under other crimes. I'm just saying, isn't her testimony proper to establish foundation for the video, too? It's an identification case, so I think I'd have to concede that point, sir. If the other crimes evidence is being used to bolster identification, then the question then becomes, does it bolster identification, Ms. Scott's identification, in order to properly admit the evidence? It can be. Yes, it is foundational. Yes, but I would argue that the other crimes evidence that was admitted did not bolster in any way Ms. Scott's identification, especially given how poor it was in this record, sir. All right. Thank you. I appreciate arguments from both counsel. We will take the matter under advisement and render a decision in due course.